UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON


Eco-Site, Inc., *et al.*,

                *Plaintiffs,*

v.                                      Case No. 3:16-cv-338
                                      Judge Thomas M. Rose

City of Huber Heights, Ohio, *et al.*,

                *Defendants.*

---

ENTRY AND ORDER GRANTING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT, ECF 38, DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, ECF 37, ORDERING
COMPLIANCE WITH THE TELECOMMUNICATIONS ACT OF
1996 AND TERMINATING CASE.

---

      Pending before the Court are cross-motions for summary judgment filed by all parties. ECF

37 & 38.   Plaintiffs Eco-Site, Inc., and T-Mobile Central LLC assert they are entitled to summary

judgment on claims that Defendants the City of Huber Heights and the City of Huber Heights

Planning Commission violated the Telecommunications Act of 1996, 47 U.S.C § 332, which

requires local governments to "act on any request for authorization to place, construct, or modify

personal wireless services facilities" by issuing a decision on such an application "in writing and

supported by substantial evidence contained in a written record."   The Act preempts local

government regulations and decisions that "prohibit or have the effect of prohibiting the provision

of personal wireless services."   Because the City's denial of Plaintiffs' application for the

proposed facility failed the "in writing" requirement of Section 332(c)(7)(B)(iii), is not supported by substantial evidence, and effectively prohibits the provision of personal wireless service in the area around the proposed facility, the City has violated 47 U.S.C. § 332(c)(7)(B). Accordingly, the Court will enter judgment in favor of Plaintiffs and issue an injunction requiring immediate approval of the application and associated permits requested therein.

## I.     Background

Plaintiff T-Mobile Central LLC provides wireless telecommunications services pursuant to licenses issued by the Federal Communications Commission. (HU 99; Expert Radio Frequency Report of Richard Conroy ("Conroy Rpt.") ¶ 3.) Providing its services requires T-Mobile to deploy a network of interrelated "cell sites" that must overlap in a grid pattern and must provide adequate signal strength and network capacity. (PLS 210; HU 9, 110; Conroy Rpt. ¶¶ 5, 9.)

Eco-Site builds, owns and operates towers and other wireless facilities that allow wireless carriers, such as T-Mobile, to create and maintain their network of cell sites. (PLS 187.)

Based on research and analysis by radio frequency engineers, T-Mobile determined that it has a significant gap in its ability to provide service for in-building residential and commercial coverage in Huber Heights in the vicinity of 7730 Taylorsville Road. (Conroy Rpt. ¶¶ 11-17.) The gap in service involves an approximately 4.6 square mile area that includes residences, schools, a fire station, various churches, commercial buildings (including Walmart) and more than a mile of Interstate 70 within a boundary comprised of Brandt Pike, I-70, Taylorsville Road, Stonehurst Drive, Deer Bluff Drive, and all the adjoining residential roads within the gap area. (Id. ¶ 15.) According to 2010 U.S. Census data, there are approximately 10,962 residents in the in-building coverage gap area. (Id.)

To remedy its gap in service, T-Mobile's radio frequency engineers identified a search area within which a new facility would need to be constructed to remedy the service gap. (Declaration of Kristopher Nickel ¶ 4 (Exh. 2).) Plaintiffs searched within the search area for available properties that may be suitable for construction of a wireless facility. (Id. ¶¶ 6-9; Declaration of Daniel Keidel ¶ 6 (Exh. 3).) To qualify as an appropriate candidate, a location would have to work within T-Mobile's existing network to remedy the service gap, comply with the local zoning requirements, be leasable, and be buildable. (Nickel Decl. ¶ 5.) After evaluating existing towers, structures, and properties within the search area, Plaintiffs concluded that the property at 7730 Taylorsville Road satisfied the criteria for potential viability. (Nickel Decl. ¶¶ 9-12.) A lease was executed with the property owner. (Id. ¶ 12.)

The property is in what Huber Heights has designated as a "Planned Public and Private Buildings and Grounds" zoning district. (HU 115.) Placement of a cell tower in such a zoning district requires a special use permit. Huber Heights Zoning Code § 1198.05. The Planning Commission may allow a Special Use if the use follows the requirements detailed in Zoning Code § 1135.10, as well as the specific requirements in Zoning Code § 1198.05 as a special use.

On February 10, 2016, Eco-Site submitted an application for a Special Use permit for a new communications facility at the property. (PLS 186-213.) Huber Heights received and filed Eco-Site's application for a special use permit on February 19, 2016. ECF 38-11, PageID 397-98, (HU 85-86.) The application initially proposed a 180-foot monopole (plus a ten-foot lightning rod, (PLS 191), which was subsequently reduced to a 169-foot tower (plus ten-foot lightning rod (HU 95)) during the administrative review process. (PLS 191; HU 95.) The application was supported with information required by the City's Zoning Code. (PLS 186-213.) A March 9,

2016 City Staff Report concluded that the application met each of the requirements detailed in the Zoning Code, "will not adversely impact any current or future use in this area," and recommended approval of the application. (HU 117.)

The matter was assigned for a hearing before the Planning Commission on March 15, 2016, but at that time it was tabled. (HU 106.)   The matter came back before the Planning Commission on June 14, 2016. (HU 94-95.)   At the hearing, Scott Falkowski, the Assistant City Manager, reviewed the staff report from March 15, 2016 and introduced the matter.   Kit Nickel, on behalf of Eco-Site, also introduced the application, and submitted an introduction and overview in support of the application. (HU 198-254.)   In Eco-Site's presentation, Nickel acknowledged that the applicant needed to satisfy Section 1198.02 and 1198.05 as part of the special use application. Additionally, Nickel acknowledged that the applicant needed to address and satisfy Section 1135.10 "General Requirements." (HU 205.)

Pursuant to Huber Heights Zoning Code Section 1135.10 "the Planning Commission shall review the particular facts and circumstance of each proposed use in terms of the following requirements and shall find by a preponderance of the evidence that such use on the proposed location: ... (c) shall be designed, constructed, operated and maintained so as to be harmonious and appropriate in appearance with the existing or intended character of the general vicinity that such uses shall not change the essential character of the same area;" ... and "(d) shall not be hazardous or disturbing to existing or future neighboring uses ... ." (HU 205-06.)   Eco-Site's response included claims that the tower was kept farther away from residential uses than required by the Code, and was gray in color.

At the hearing, three residents appeared and spoke in opposition to the tower. Concerns included the "fall zone" of the tower–whether or not it would be on their property if it fell. See (HU 99.) Another neighbor was concerned that the tower was hazardous and prevented him from using all aspects of his property in the future, as it would restrict residential building due to the fall zone. (HU 100.) He claimed that an FHA loan cannot be obtained if property is within a cell tower fall zone. Id. Falkowski noted that one neighbor had raised a concern that the depth of the proposed tower foundation would affect the well used to supply water to his home. (HU 108.) The neighbor who raised a concern about the potential effect on his well water was one who spoke. He also stated that he would "welcome better cell coverage." (HU 111.) The other two speakers also raised general aesthetic concerns, asked whether there would be noise emitted from the facility, and reiterated the concern about well water. (HU 111-113.)

Nickel was also asked exactly what coverage needs or what coverage issues T-Mobile had so as to seek a tower in this location. (HU 100.) Nickel responded that they were not "just talking about coverage; they are not just talking about blanketing an area with signals. They are talking about capacity." (HU 99.)

At the conclusion of the March 15 meeting, the Planning Commission tabled consideration of the application so that Plaintiffs could conduct a soil study to address the concerns about well water. (HU 106.) Thereafter, Plaintiffs commissioned a geotechnical soil analysis that confirmed that the foundation of the proposed facility would not interfere with the area groundwater. (HU 215-254.) Nevertheless, Plaintiffs offered a shallower, alternative foundation design in an effort to further alleviate any community concerns. (HU 95.)

The Planning Commission considered the application again on June 14, 2016. Falkowski provided information about the soil study, communicated Eco-Site's offer of an alternative foundation, and also stated that the height of the proposed facility had been lowered by 11 feet. (HU 95.) In response to arguments that the proposed facility would negatively impact the historic nature of the surrounding properties, Falkowski confirmed that none of the area properties were designated historic. (HU 103.) Several letters were also submitted raising general concerns. (HU 177-181, 184-197.)

When asked whether all options had been exhausted and if this was the best option, Scott Falkowski stated that "it is the Applicant's proposal. The City did not go out and look for sites. That is not the City's job." (HU 96.) Similarly, Nickel indicated that multiple sites were considered and that Eco-Site chose one that "made more sense and they went to that property." (HU 96.)

After the presentation, the Planning Commission discussed the matter. One voting member of the Planning Commission, Member Webb, emphasized the general requirements in the Zoning Code under Section 1135.10. Webb noted that the preponderance of the evidence required under Section C that the proposed use be "harmonious and appropriate in appearance with the existing or intended character of the general vicinity..." and that under Section D, that the proposed use not be "hazardous or disturbing to existing or future neighborhood uses." (HU 103.)

At the June 14 Meeting, a motion to approve the application failed by a 1-4 vote, denying the application, with no administrative appeal available. (HU 93.) The City provided the written denial (HU 93) to Eco-Site on July 12, 2016 (HU 18). The one-page decision does not list reasons

for the denial. (HU 93.)   The minutes of the June 14 Meeting (HU 94-103) were provided to Eco-Site on August 10, 2016 (HU 12).

Plaintiffs filed their complaint August 11, 2016. (ECF 1.)   They amended their complaint January 18, 2018. (ECF 36.)   All parties filed cross-motions for summary judgment January 22, 2018. (ECF 37, 38.)

## II.    Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law.   Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).   Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).   Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323.   The burden then shifts to the nonmoving party who "must set

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.   It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255.   If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726.   Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III.    Analysis

Plaintiffs allege the Commission's decision to deny the application was not supported by substantial evidence contained in a written record as required by Section 332(c)(7)(B)(iii).   They

further allege the Commission's decision to deny the application prohibits or has the effect of prohibiting T-Mobile from providing personal wireless services in the significant gap area in violation of the Act, 47 U.S.C. § 332(c)(7)(B)(i)(II).

The Telecommunications Act of 1996, 47 U.S.C § 332, requires local governments to "act on any request for authorization to place, construct, or modify personal wireless services facilities" by issuing a decision on a relevant application "in writing and supported by substantial evidence contained in a written record," and the Act preempts local government regulations and decisions that "prohibit or have the effect of prohibiting the provision of personal wireless services."

The Supreme Court has held that to satisfy Section 332(c)(7)(B)(iii)'s "in writing" requirement, a locality must provide clearly articulated reasons in written form. *T-Mobile South, LLC v. City of Roswell*, 135 S. Ct. 808, 818 (2015). This is required because "[i]n order to determine whether a locality's denial was supported by substantial evidence, as Congress directed, courts must be able to identify the reason or reasons why the locality denied the application." Id. at 814. Further, Section 332(c)(7)(B)(v) requires Plaintiffs to file an appeal within 30 days of the City's denial. 47 U.S.C. § 332(c)(7)(B)(v). As the Supreme Court recognized, the purpose of the "in writing" requirement is, in significant part, to allow the applicant to know whether and what to appeal under the short, 30-day statute of limitations. *Roswell*, 135 S. Ct. at 816.

In this case, the denial did not articulate any reasons. (HU 93.) While the minutes of the June 14 meeting reflect the reasons for the denial, the minutes were not provided to Eco-Site until August 10, 2016 – twenty-nine days after the written denial and one day before Plaintiffs' statutory deadline to file an appeal. (HU 12; Nickel Decl. ¶ 18.) In *Roswell*, the Supreme Court held that meeting minutes provided twenty-six days after the written denial violated the Act, emphasizing

that "a locality cannot stymie or burden the judicial review contemplated by the statute by delaying the release of its reasons for a substantial time after it conveys its written denial." 135 S. Ct. at 816. That is what the City did here.

Moreover, the meeting minutes do not clearly state the reasons for the denial. They reflect general discussion among the members of the Planning Commission before the motion to approve the application. (HU 103-105.) Plaintiffs were left to guess at the City's reasons before filing their Complaint. See 135 S. Ct. at 816. Accordingly, the City failed to provide either a written denial with reasons, or separate reasons "contemporaneously" with the denial, as required by 47 U.S.C. § 332(c)(7)(B)(iii). Plaintiffs are entitled to summary judgment on this ground.

As the Supreme Court emphasized, a reason for requiring clear reasons with the denial is that the City may only defend its denial based on the reasons given in the denial. *Roswell*, 135 S. Ct. at 816 n.3; see also *National Tower, LLC v. Plainville Zoning Bd. App.*, 297 F.3d 14, 21 (1st Cir. 2002); *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 803 (6th Cir. 2012) (arguments raised by the township during litigation not properly before the Court). Here, neither Plaintiffs nor the Court can be certain of the reasons for the denial. However, even the reasons that can be gleaned from the minutes are not supported by substantial evidence in the record.

"[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera v. NLRB*, 340 U.S. 474, 477 (1951) (citations omitted). The Court must determine if there is sufficient, substantiated evidence in the written record to support the reasons for the denial. *W. Bloomfield*, 691 F.3d at 798-800.

As the Sixth Circuit explained: "There must be evidence. And not just any evidence–evidence that is substantial. And substantial evidence must be substantiated by something." Id. at 801. Substantial evidence review examines whether the Planning Commission "explained any credibility judgments it made and whether it gave reasons for crediting one piece of evidence over another," and must consider all the evidence that was presented to the Planning Commission, including evidence that does not support the denial. Id. at 799. Substantial evidence review is restricted to the evidence that was before the local governmental authority, and evidence from outside the administrative record is not permitted. See, e.g., *W. Bloomfield*, 691 F.3d at 798; see also *T-Mobile South, LLC v. Coweta Cty.*, No. 3:-07-CV-059- JTC, 2008 U.S. Dist. LEXIS 124733, at *17 (N.D. Ga. Sept. 30, 2008).

Record evidence demonstrates that the proposed facility meets the requirement that the use be "harmonious and appropriate in appearance with the existing or intended character of the general vicinity that such uses shall not change the essential character of the same area." Zoning Code 1135.10 (c). The proposed facility is "appropriately located within an area of decreasing population density, large lot residential, public use and agricultural uses." (PLS 195.) The placement of the tower is more than 150% farther away from residential uses than is required by the Code, and the tower is designed to "blend[] well against the typical grey skies we have in Ohio." (Id.) While Commissioner Webb restated the Code requirement (HU 103), and stated his belief that the tower "will look out of place and not be harmonious with the surrounding environment," (HU 104.) Webb's opinion, however, motivated only his own vote. (HU 103.) Assistant City Manager Falkoski stated that the area is not listed as historic. (HU 104.) Thus, Webb's opinion about the surrounding environment was based on a faulty premise.

The community member comments in opposition to the application were unsupported, generalized, and speculative. See, e.g., *W. Bloomfield*, 691 F.3d at 800 ("General concerns from a few residents that the tower would be ugly or that a resident would not want it in his backyard"); *Cellco P'ship v. Franklin Cty.*, 553 F. Supp. 2d 838, 851-52 (E.D. Ky. 2008) (same); *Cellular S. Real Estate, Inc. v. City of Germantown*, No. 2:12-cv-02888- JPM-tmp, 2015 WL 3852781, at *3 (W.D. Tenn. June 22, 2015). One opposition letter submitted by a neighbor across the street from the proposed facility claimed that the City's Comprehensive Plan "re-affirms my western boundary as sacrosanct," but did not identify any part of the Comprehensive Plan that supports this statement. (HU 176). In fact, the Comprehensive Plan designates Taylorsville Road as a "major road" and the surrounding area is designated as a "grow and enhance" area, highlighting "the importance between the coordination of new infrastructure, facilities, and services with demand from new residential and business development." Huber Heights Comprehensive Plan at 13 (adopted Nov. 28, 2011) https://www.hhoh.org/DocumentCenter/View/400/Comprehensive-Plan-PDF.

The Zoning Code does not require that towers be invisible or even concealed. See Zoning Code § 1198.05. The City's Code specifically allows telephone towers up to 200 feet tall as a Special Use in the zoning district. Zoning Code § 1198.05(b). In fact, the Code requires that towers be designed as freestanding, monopole structures, and they have to be able to accommodate additional users. Zoning Code § 1198.05(e)(3).

While several letters mentioned it, none of the Commissioners mentioned potential impact on property values, and thus it cannot now be identified as a basis for the denial. *W. Bloomfield*, 691 F.3d at 803. There is no substantiated evidence to support this claim. Unsubstantiated

assertions about property value are not substantial evidence. *W. Bloomfield*, 691 F.3d at 800; *Germantown*, 2015 WL 3852781, at \*7.

Questions were raised regarding the fall zone if the proposed facility were to fail, but Plaintiffs' representative demonstrated that the monopole is designed to fold into itself (HU 99) and Falkoski made the same point (HU 107). Additionally, Eco-Site demonstrated that the proposed facility would be more than 150% farther away from residential structures than the Code requires. (PLS 195.)

Another question was raised about the potential impact of the proposed facility on the groundwater and neighboring wells. Plaintiffs responded to that concern, submitting a geotechnical soil analysis confirming that the proposed facility would not interfere with the area groundwater. (HU 215-254.) Nevertheless, Plaintiffs offered an alternative foundation design in an effort to further alleviate any community concerns. (HU 95.) Ultimately, one of the neighbors that voiced this concern acknowledged that the proposed facility would not affect his well. (HU 101.) There is no substantial evidence that the proposed facility would be hazardous to existing or future neighboring uses. Mere speculation is not substantial evidence. *W. Bloomfield*, 691 F.3d at 800-01.

There is also no evidence that the proposed facility would disturb existing or future neighboring uses. Questions about noise and lighting were answered. (HU 102.) And the Assistant City Manager clarified that the City Code would not allow another residence to be built on the property of a resident who complained the tower would prevent him from installing another residence in any event. (HU100.) Further, the Staff Report concluded that the proposed facility

"will not adversely impact any current or future use in the area." (HU 102.)   To the degree the denial is based on failure to meet this provision, it is not based on substantial evidence.

The proposed facility also meets the requirement that the use "shall not result in the destruction, loss or damage of a natural, scenic or historic feature of major importance." Zoning Code 1135.10(i).   The Ohio State Preservation Office completed a review of all existing historic and unlisted but eligible properties in the area and found no negative impact. (HU 207.) Commissioner Webb argued that the area is historic, (HU 103), but the Assistant City Manager clarified that neither the area nor any property in the area around the proposed facility is designated as historic. (HU 104.)   There was similarly no evidence regarding the "scenic" nature of the area or any specific property, let alone evidence as to how the proposed facility would damage a feature of major importance.   Accordingly, to the degree the denial was based on the failure to meet this requirement of the Code, it is not supported by substantial evidence.

The denial of the proposed facility also violates § 332(c)(7)(B)(i)(II) of the Act because it effectively prohibits T-Mobile from providing personal wireless service in the area around the proposed facility.   Section 332(c)(7)(B)(i)(II) provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

The Sixth Circuit employs a two-part test to determine whether a denial of an application amounts to an effective prohibition of service, stating that "there must be (1) a showing of a 'significant gap' in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations." *W. Bloomfield*, 691 F.3d at 805 (internal quotation marks and citation

omitted). If a plaintiff satisfies both parts of this test, the denial results in an effective prohibition of service in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

To demonstrate that T-Mobile has a significant gap in service, Plaintiffs have submitted an expert report from Richard Conroy and his testimony, both demonstrating the gap using radio frequency propagation maps that model coverage. (Conroy Rpt. ¶¶ 11-17.) Specifically, the gap in service is caused by a lack of reliable in-building residential and commercial coverage. (Conroy Rpt. ¶ 11.) The gap in service affects over 10,000 people in the gap area. Id. ¶ 15. The gap area is significant based on the number of people, the many businesses, and the busy roadways within the gap area. See, e.g., *W. Bloomfield*, 691 F.3d at 807 (finding gap significant based on major commuter highway and fully developed residential areas). There is no requirement that actual customer complaints need to be submitted to demonstrate a coverage gap. *W. Bloomfield*, 691 F.3d at 807. The undisputed evidence demonstrates that T-Mobile has a significant gap in the area.

The second prong of the effective prohibition analysis "require[s] the provider to show that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." *W. Bloomfield*, 691 F.3d at 808 (internal quotation marks and citation omitted). A provider satisfies the "least intrusive" standard when it makes "a showing that a good faith effort [was] made to identify and evaluate less intrusive alternatives." Id. Such a good-faith effort is proven where a plaintiff presents evidence that they investigated and ruled out multiple potential alternative sites. See id.; see also *Germantown*, 2015 WL 3852781, at *9-10; *Wilson Cty.*, 2014 WL 28953, at *12; Sk*yway Towers, LLC. v. Lexington Fayette Urban Cty. Gov't*, No. 5:15-301-KKC, 2016 U.S. Dist. LEXIS 25374, at *17-21 (E.D. Ky. Feb. 29, 2016).

Evidence that an alternative will not provide sufficient coverage to remedy the gap is sufficient to rule out that alternative. *Germantown*, 2015 WL 3852781, at *9-10.

An applicant is not required to eliminate all possible alternative locations; it need only demonstrate a good-faith investigation for less intrusive alternatives. See *W. Bloomfield*, 691 F. 3d at 808. Plaintiffs are not limited to investigation undertaken before the City's denial. Because Section 332(c)(7)(B)(i)(II) concerns "the effect" of the denial, evidence developed after the administrative record is relevant and admissible, particularly where, like here, the local code does not require evidence on the issues. See, e.g., *Sprint Spectrum, L.P. v. Zoning Bd. of Paramus*, 606 Fed. App'x 669, 671 (3d Cir. 2015); *APT Pittsburgh LP v. Penn Twp.*, 196 F.3d 469, 475 (3d Cir. 1999); *National Tower*, 297 F.3d at 22; *VoiceStream Minneapolis, Inc. v. St. Croix Cty.*, 342 F.3d 818, 833 (7th Cir. 2003).

Once a showing of a good-faith investigation of alternatives has been made, the burden shifts to the locality to identify that there are less intrusive alternatives available. The district court in *West Bloomfield* adopted this approach from the Ninth Circuit. *T-Mobile Cent. LLC v. Charter Twp. of W. Bloomfield*, No. 09-13496, 2011 WL 1299357, at *5 (E.D. Mich. Mar. 31, 2011), aff'd, 691 F.3d 794 (6th Cir. 2012) ("*W. Bloomfield I*") (citing *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 998 (9th Cir. 2009)). The Sixth Circuit has found it significant when a township identified no additional alternative other than two that were ruled out. *W. Bloomfield*, 691 F.3d at 808.

The City's burden cannot be satisfied by purely speculative alternatives. See *Anacortes*, 572 F.3d at 998. It requires evidence demonstrating the availability and viability of some less intrusive alternative. *W. Bloomfield I*, 2011 WL 1299357, at *5-6; *Wilson Cty.*, 2014 WL 28953,

at *11 ("Merely flagging an apparently unviable alternative does not create an issue of fact."); see also *W. Bloomfield*, 691 F.3d at 808.

Here, it is uncontroverted that the proposed facility is the least intrusive means of remedying T-Mobile's significant gap in service. As Nickel and Keidel testify in their Declarations, Plaintiffs have undertaken a good-faith investigation of potential sites and alternatives. Moreover, Plaintiffs' investigations have been based on communications directly from the City. (Nickel Decl. ¶¶ 3-15; Keidel Decl. ¶¶ 3-7.) Thus, Plaintiffs have been investigating and proposing sites that the City supposedly considered the least intrusive possibilities.

T-Mobile's radio frequency engineers issued a "search ring" that identifies an area within which a new facility must be installed to remedy T-Mobile's identified significant gap in service. (Nickel Decl. ¶ 4.) Nickel, the site acquisition specialist that investigated potential sites in the search ring, initially starting in 2014, evaluated every property in the search ring by analyzing the City's Code and zoning map, and personally inspecting every property. (Id. ¶ 6.) Nickel confirmed that there are no existing towers or other tall structures on which T-Mobile could install its antennas. (Id. ¶ 7; PLS 209-213.)

Based on his review, Nickel initially identified a commercial area as the most likely candidate. (Id. ¶ 9.) But the City's Assistant City Manager and Zoning Officer advised Nickel that the City did not want a tower in the commercial area near the Interstate 70 interchange with Brandt Pike. (Id.; see also 30(b)(6) Dep. at 18:15-23.) Instead, communication with City Staff identified two churches on Taylorsville Road that could meet the Code. (Nickel Decl. ¶ 9; 30(b)(6) Dep. 21:10-16; HU100.) Following his discussion with the City, Nickel investigated the two

churches, and the Baptist Temple agreed to allow a tower on its property (the Sulphur Grove Methodist Church refused). (Nickel Decl. ¶¶ 10-12.) In addition, Nickel evaluated the Walmart property, but it was in the area the City identified as sensitive, and Nickel's past experience with Walmart was they did not allow wireless towers. (Id. ¶ 8.)

After the Planning Commission denied the application to install a tower at the Baptist Temple, the City identified five additional locations that it believed may be acceptable in light of its values. (Keidel Decl ¶ 4-5.) Plaintiffs made a thorough investigation of each of the five City identified locations, but none were both available and feasible for installation of a tower. As Keidel testifies, the owners of the Cedar Hill Furniture property refused to allow a tower. (Id. ¶ 6.) The J.D. Byrider Properties was too small to house a tower and would not be able to comply with the City Code's setback requirements. (Id.) The property at 7570 Brandt Pike was heavily wooded, with no current access, and there was active remediation of an underground gas tank on adjoining property that rendered the site infeasible. (Id.) The Agape Ministries property was rough terrain with no access road or utilities, and, ultimately, the Ministries refused to lease a portion of the property. (Id.) Finally, Goodwill refused to lease its property for a wireless tower. (Id.) Courts have found that explanations of why other sites were ruled out is sufficient to demonstrate that the proposed site is the only feasible or least intrusive location. See, e.g., *W. Bloomfield*, 691 F.3d at 797; *Telespectrum*, 227 F.3d at 417-18; *Cellco P'ship.*, 553 F. Supp. 2d at 849; *Germantown*, 2015 WL 3852781, at *9-10; *Wilson Cty.*, 2014 WL 28953, at *12-13; *Skyway Towers*, 2016 U.S. Dist. LEXIS 25374, at *17-21.

In addition, to further lessen potential impact, after the denial, Plaintiffs responded to requests by the City to move the proposed tower on the Baptist Temple property, proposing to

move to the west, farther from abutting properties, as far as the church would allow. (Declaration of James Lockhart ¶ 4 (Exh. 5).) Nonetheless, at a meeting on September 1, 2017, the City Council voted to reject the proposed alternative location. (Id.)

Plaintiffs have investigated every potential alternative identified by the City and none are actually available and technologically feasible. Although Plaintiffs have asked both in discovery and at a deposition of the City's Rule 30(b)(6) representative, the City has not identified any other alternative site or design that it alleges is less intrusive. (30(b)(6) Dep. 80:4-81:13, 99:5- 9.) Accordingly, the City has not satisfied its burden under *West Bloomfield* and *City of Anacortes*. The evidence demonstrates that the proposed facility is the least intrusive means of remedying T-Mobile's significant gap, and, therefore, the denial is an effective prohibition of wireless service in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

"[T]he Sixth Circuit has 'repeatedly concluded that where the defendant denied a permit application, and that denial violated the [Act's] 'in-writing' and 'substantial evidence' requirements, the proper remedy is injunctive relief compelling the defendant to issue the requested permit.'" *Franklin Cty.*, 553 F. Supp. 2d at 853 (quoting *Tennessee ex rel. Wireless Income Props., LLC v. City of Chattanooga*, 403 F.3d 392, 399 (6th Cir. 2005)). The same is true for violations of the effective prohibition provision of the Act. See, e.g., *City of Knoxville*, 2016 WL 3747600, at *8; *Wilson Cty.*, 2014 WL 28953, at *14; *W. Bloomfield I*, 2011 WL 1299357, at *7. Indeed, the Sixth Circuit has found that failure to issue injunctive relief for a violation of the Act is an abuse of discretion. *Chattanooga*, 403 F.3d at 400; see also *New Par v. City of Saginaw*, 301 F.3d 390, 399-400 (6th Cir. 2002) (explaining that injunctive relief is necessary to preserve

applicants' rights to expedited review), abrogated on other grounds by *Roswell*, 135 S. Ct. at 813-14.

## IV.    Conclusion

Because the City's denial of Plaintiffs' application for the proposed facility failed the "in writing" requirement of Section 332(c)(7)(B)(iii), is not supported by substantial evidence, and effectively prohibits the provision of personal wireless service in the area around the proposed facility, the City has violated 47 U.S.C. § 332(c)(7)(B).   Accordingly, Plaintiffs' Motion for Summary Judgment, ECF 38, is **GRANTED**.   Defendants' Motion for Summary Judgment, ECF 37 is **DENIED**.

The Clerk is **ORDERED** to enter judgment in favor of Plaintiffs, against Defendants.   The Clerk is **ORDERED** to issue a declaration that:

   a.  the Defendants violated Section 332(c)(7)(B)(iii) of the Telecommunications Act of 1996, because the denial of the application was not in writing supported by substantial evidence contained in a written record;

   b.  the Defendants' denial has effectively prohibited Plaintiffs from closing a significant coverage gap in the provision of wireless service in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II);

   c.  the Defendants' actions are preempted by the Telecommunications Act of 1996 and are therefore void and invalid;

   d.  Defendants are **ORDERED** to:

  i.  grant forthwith Plaintiffs' application Zoning Case 16-11 for a Special Use Permit for a new wireless telecommunications facility at 7730 Taylorsville Road in Huber Heights consistent with Plaintiffs' application;

  ii.  grant forthwith all other authorizations necessary for the construction of said facilities; and

  iii.  grant forthwith final approvals of any and all necessary permits for the construction of said facilities.

The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton. **DONE** and **ORDERED** in Dayton, Ohio, this Friday, June 22, 2018.


s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE